**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  06-307 (EGS)** |
| | : | |
| **v.** | : | |
| | : | |
| **KESARIMANGALAM  KANNAN** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia,  respectfully submits this memorandum in aid of sentencing.

**I.     BACKGROUND**

On November 1, 2006, the defendant pled guilty to Attempt to Entice a Minor to Engage in Sexual Activity,  in violation of  18 U.S.C. §  2422(b).  The uncontroverted evidence presented at the time of the plea showed that between June 21, 2006 and September 15, 2006, the defendant, while in his house which he shares with his family in Germantown, Maryland, entered into a "romance" chatroom on the internet, using the screen names "stoneman1" and "treehillfield".  While in the chatroom, the defendant chatted with an individual who identified herself as a thirteen year-old girl residing in Washington, D.C.  The child, in fact, was a Metropolitan Police Detective acting in an undercover capacity.

During the course of the conversation, the defendant, who thought he was talking to a little girl, talked about having sex with her.  The defendant asked the "child", "do u sleep with ur daddy?", and then asked her to send a picture of herself.  After the child sent a picture of herself wearing a panda bathing suit, and looking very much like a ten or eleven year-old child, defendant  told the "child", "u have nice boobs...cute lips...can I suck it."  The defendant then

1

asked the "child" for her address, telling her, "we can meet and talk" and defendant told the "child" that she is his "little girl".

What happened next, undersigned counsel submits, is chilling.  Defendant began telling the "child" how he would come to her house undetected.  Defendant told the "child" "...if I have ur address, we can meet sometime and talk".  The "child" suggested that they meet down the street since she explained, she doesn't "want to get in trouble".  The "child" further explained that she was scared to give out her address.  The defendant continued pushing for her address:

> **Kannan: if you trust me, give ur address, otherwise don't**

> **"Child":    well, like I just don't want mom to be home she would freak**

> **Kannan: I said I would be careful**

Defendant began asking dozens of questions about the "child":

> **Kannon: where is ur dad...do you stay home at night...what is ur address, ur mom wont know...can i touch ur pussy...I wont do anything if u don't like it...I wont hurt u in any way...have u not touched ur pussy rself?...want to touch my dick?...have u touched a dick?...what is your apartment number?...is there anything on the door to identify...how do I come in if door is locked...if door is locked how can I comunicate with u...will u take me to ur room?...u have nice pussy...have you seen your mom and dad having sex?...it may bleed the first time, do u mind...I will do it slowly...you will ask for more when its done...**

A few days later, without having planned to meet on a specific date and time, defendant told the child that: "I came yesterday, I could not find ur place".  On July 7, 2006, after Kannan had arranged to meet the child on July 11th at 1317 Adams Street, N.E., defendant was observed at the place described as the "child's" house. Law enforcement officers, not knowing that he was

Kannan, asked him for his identification, and let him go. On July 18th, 2006, Kannan told the "child" that he had come by her house but had been questioned by "cops", so he left. Between July and September, Kannan tried to contact the "child" several times using a different screen name. Not recognizing the new screen name, the undercover did not respond to him. In September, 2006; however, Kannan explained that he had formerly used the original screen name until he was stopped by the police. On September 14, 2006, Kannan contacted the "child", asked if he could "suck your boob in the car...can I touch your pussy also". Kannan told the "child"

that he would meet her at the Subway Sandwich Shop on 13th Street, N.E. at 5:40 p.m. On September 15th, 2006, Kannan arrived at the Subway Sandwich Shop on 13th Street, N.E., looked inside the shop, and continued to walk around the area looking around. Officers recognized him as the same person they saw several months earlier at the "child's" house. Defendant was arrested. Subsequent investigation revealed that defendant's computer had received a picture of the "child".

## II.    SENTENCING CALCULATION

     A     Statutory Maximums

 Pursuant to Title 18, United States Code, Section 2422(b) carries a minimum sentence of 5 years, and a maximum sentence of 30 years in prison, a fine of $ 250,000, and a maximum term of supervised release of life.

     B.     Sentencing Guidelines Calculation

     The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 23. See PSR ¶ 34. (This calculation contemplates a two level

enhancement for using a computer.) The PSR calculates the defendant's criminal history as Category I.  See PSR ¶ 37. The guideline range for the defendant is calculated at 46 to 57 months.   For the reasons set forth, infra Section III of this Memorandum, the government respectfully recommends that the Court sentence the defendant to five years in prison and impose a period of supervised release for life.

**III.   GOVERNMENT'S RECOMMENDATIONS**

      A.     Acceptance of Responsibility

The government agrees with the PSR¶ 33 that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines since defendant accepted responsibility for the offense.

      B.     Application of the Federal Guidelines post-Booker

It is the government's position that the Court should impose a sentence within the guidelines range.  In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  Booker, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and

commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  Id. at 769.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense; (B) to afford adequate

deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant;

and (D) to provide the defendant with needed educational or vocational training, medical care, or

other correctional treatment in the most effective manner"; and "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."

       Indeed, the Sentencing Commission formulated the Guidelines only after initially

canvassing prior sentencing practice and attempting to identify and assign weights to all the

factors – both aggravating and mitigating – that judges traditionally used in determining an

appropriate sentence.  See United States Sentencing Comm'n, Supplementary Report on the

Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m)

(requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of

the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168

(Commission should produce a "complete set of guidelines that covers in one manner or another

all important variations that commonly may be expected in criminal cases").  Moreover, since

the Guidelines were adopted, the Sentencing Commission has continued to study district court

and appellate sentencing decisions and to "modify its Guidelines in light of what it learns."

Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting

information about actual district court sentencing decisions  . . . and revising the Guidelines

accordingly").

       It thus remains true that, absent unusual circumstances, the sentence in a criminal case

should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice

in the various opinions in <u>Booker</u> recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  <u>See, e.g.</u>, <u>id.</u> at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); <u>id.</u> at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); <u>id.</u> at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

<u>Booker</u>, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness."  <u>See Booker</u>, 125 S. Ct. at 764.  Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, <u>see</u> 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable.  <u>Booker</u> not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity

7

their reasoning, Booker also continues to subject the explanation of the decision to sentence

outside of the correctly calculated range to a court of appeals reasonableness review.  See 18

U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section

3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable

Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a

sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section

3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when

the district court fails to provide a required statement of reasons in the judgment and

commitment order).

      Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing

and should occur absent unusual circumstances.  This is so, said the court in United States v.

Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the

Guidelines represent the product of an expert commission, that has studied the sentencing

process at great length, under the specific mandate of Congress, to fashion recommended

sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson

held, plainly reflect the public's will, as expressed by their democratically elected

representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust

them to congressional preference.  Wilson further observed that guided sentencing appears to

have had a positive impact in deterring criminal conduct throughout the country, and thus serves

the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge

Cassell determined that "the court will give heavy weight to the Guidelines in determining an

appropriate sentence.  In the exercise of its discretion, the court will only depart from those

Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 912.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report, in addition to the imposition of sentence for the D.C. offenses.

C.    Basis for Government's Sentencing Recommendation

The government is requesting a sentence at the top of the defendant's guidelines range. Such a sentence is more than supported by:  (1) the facts surrounding defendant's offense, (2) the potential risk of danger for children had the child been real and (3) the defendant's frightening behavior in this case.

Defendant's conduct in this case makes clear that he is deviant and dangerous. Upon being told by the "child" that she was 13 years-old, a law-abiding person would have stopped chatting with the child and would have never turned back.  This man, not only continued talking to her, but asked her very detailed questions about her family, her life, her guardians: where were they, when would they be home, where they work, details about her apartment, his willingness to put her in his car, details about what he wanted to do with her, his absolute resolve to find out where she lived, and the fact that he showed up at her house without notice.  The defendant committed this crime in a setting that he thought was behind closed doors and private.  He

thought that he was talking to a child and that he could get away with anything since he thought

that the child was powerless and young.   As the Court can see by the defendant's statements to

the child,  while he thought nobody was listening, the defendant poses a grave threat to the

community.    Clearly, this conduct needs to be punished severely.  The defendants subsequent

trips to D.C. show how truly dangerous he is.

      This behavior was devious and  reckless.  The thought that the child could have been real

is frightening.

      Accordingly, the government believes that a long prison term a lifetime of supervise

release is the only appropriate sentence in this case.

## IV.    <u>CONCLUSION</u>

      Wherefore, the government respectfully requests that the Court sentence the defendant to

the mandatory minimum prison term of five years plus a lifetime of supervised release.


Respectfully submitted,


JEFFERY A . TAYLOR
United States Attorney
Bar No. 498610


_____
JULIEANNE HIMELSTEIN
Assistant United States Attorney
Major Crimes Section, Mass.  Bar No. 417-136
555 4th Street, N.W.  Room 4832
Washington, DC 20001
Phone: 514-8203
Fax: 353-9414

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant, this ___ day of March, 2007.

                                  _____

                                  JULIEANNE  HIMELSTEIN
                                  Assistant United States Attorney